**HARBERT/LUMMUS, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 93–207C.

United States Court of Federal Claims.

Aug. 30, 1996.

Edward S. Allen, Birmingham, AL, for plaintiffs. M. Stanford Blanton, Lee Ann Pounds, and Lisa J. Sharp, of counsel.

Mark A. Melnick, with whom were Assistant Attorney General Frank W. Hunger and David M. Cohen, Washington, DC, for defendant. I. Avrum Fingeret, Department of Energy, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action for breach of contract. Plaintiff[1] alleges that the United States, acting through the Department of Energy (DOE), breached express oral contracts and one express or implied-in-fact oral contract.[2] Trial was held April 15–19, 1996, in Birmingham, Alabama.[3] For the reasons set forth

---

1. Harbert/Lummus, a joint venture of Harbert International Inc. and Lummus Crest Inc., will be treated as a single plaintiff for purposes of this case. Lummus was a subsidiary of Combustion Engineering, Inc. Throughout the opinion the plaintiff will be referred to as either "Harbert/Lummus" or "the Joint Venture."

2. Plaintiff seeks $15,723,830.

3. On December 22, 1994, this court denied cross motions for summary judgment in this case ruling that certain material facts were still at issue. *Harbert/Lummus, et. al. v. United States*, No. 93–207C (December 22, 1994). These issues were identified as:

Whether any authorized DOE official promised to approve the revision of the Disbursement Schedule in the EPC Agreement from twenty-one to eighteen months, provided that the construction monitor certified that the Construc-

tion Schedule was being so accelerated? Whether any authorized DOE official ratified such a promise? Whether Harbert/Lummus informed the DOE of its belief that such an agreement had been reached? Whether the DOE failed to correct any misunderstandings concerning an accelerated schedule which it knew were possessed by Harbert/Lummus? Whether an authorized official of the DOE promised to continue its guarantee of the funding for the Agrifuels Project as an inducement to have Harbert/Lummus complete the Project? Whether Michelson or other DOE officials had been delegated sufficient authority to bind the Government to an agreement to amend the Disbursement Schedule and to continue to support the project to completion? Whether the DOE possessed the approval authority over the terms and conditions of the EPC Agreement as a condition of the Guarantee Agreement.

below, the court finds that an express oral contract to guarantee the funding of the project to completion was formed between the plaintiff and DOE.

## FACTUAL BACKGROUND

In response to the oil crisis in the late 1970's, the Federal Government began investigating alternative sources of energy. As a result, Congress passed the Energy Security Act,[4] which established different mechanisms for the public and private sector to develop alternative sources of fuel. One of these mechanisms, set out in the Biomass Energy and Alcohol Fuels Act of 1980 ("the Act"),[5] was the Alcohol Fuels Program ("Program"). The Program was designed to encourage private companies to design and build alternative fuel energy plants. The Act created an Office of Alcohol Fuels ("Program Office") . within the DOE to implement and administer the Program.[6] 42 U.S.C. § 8820 (1988).

Specifically, the Act vested the Program Office with the power to issue government loan guarantees for up to 90 percent of the cost of construction of ethanol and other alternative fuel plants. 42 U.S.C. § 8814(b)(1) (1988). By issuing loan guarantees, the Government hoped that banks would be more willing to lend the capital needed to complete the experimental plants. Approximately forty applications were initially received by the Program Office. This number was then culled to fifteen. Of these, seven received conditional commitments for loan guarantees.

*Id.*

4. Pub.L. No. 96–294, 94 Stat. 611 (June 30, 1980).

5. The Biomass Energy Act was established by section 201 of the Energy Security Act.

6. Three entities within the DOE had oversight power on the alternative fuels program. These were, the Program Office, the Procurement Office and the Office of the General Counsel.

7. Ultimately, only three of the conditional commitments resulted in actual loan guarantees. In addition to the Agrifuels project, DOE guaranteed funding for the New Energy Company of Indiana project and for the Ten–Al project in Tennessee.

One of these conditional commitments went to Agrifuels Refining Corporation ("Agrifuels").[7] Agrifuels was a wholly owned subsidiary of Edgington Oil Company, Inc., which, in turn was owned by Triad Energy Corporation.[8] Agrifuels had attempted to build an alcohol fuels plant on its own, prior to the passage of the Biomass Act, but could not obtain adequate financing. After receiving the conditional commitment, Agrifuels began looking for a contractor to perform the actual construction. The plant was to be located in New Iberia, Louisiana, and was to convert sugar cane into 100,000 gallons of ethanol per day, which could then be added to gasoline.[9] Agrifuels contacted Harbert/Lummus in the hope that the Joint Venture would take on the actual construction of the facility. Harbert/Lummus had worked on a similar plant in Tennessee and therefore had experience in construction of alternative fuel plants.[10] Harbert/Lummus submitted a bid to Agrifuels in December, 1984, for $67.5 million.

Negotiations began between Agrifuels, DOE, and several banks to work out the details of the loan guarantee. The conditional commitment of the loan guarantee was due to expire on April 30, 1984.[11] The negotiation process was very complex, with Agrifuels having to complete several agreements, the most important of which were: an Engineering Procurement and Construction ("EPC") agreement with Harbert/Lummus for the construction of the project; a loan guarantee agreement between Agrifuels,

8. Triad was owned by Newedge Energy Corporation. Edgington, Triad and Newedge were collectively known as the Triad Group.

9. Agrifuels hoped to make $35 million per year in gross proceeds from the refining plant.

10. The plant in Tennessee, Ten–Al, was also backed by DOE loan guarantees and administered by the Office of Alcohol Fuels.

11. As the negotiations continued and the deadline approached, Congress extended the conditional commitment deadline from April 30, to September 30, 1984.

DOE, and the lending banks [12]; and a loan servicing agreement between Agrifuels, DOE, and Hibernia National Bank ("Hibernia"), the servicing bank. During the negotiations Agrifuels was represented by its president Patrick Hamilton, the Joint Venture was represented by Leonard Wohadlo, the president of Harbert International, and Bobby Brabham, a technical representative for the Joint Venture. DOE was represented by the contracting officer Stephen J. Michelson, who was also Director of the Financial Incentives Operations Division, Daniel Beckman, the Deputy Director of the Program Office, and Doug Mitchell, a DOE attorney. The banks were represented by James L. Croyle from the Bank of New England ("BNE").[13]

Agrifuels and the Joint Venture negotiated the construction contract. Nevertheless, Agrifuels kept DOE informed of the negotiations because under the terms of the conditional commitment DOE had veto power over the content of the EPC agreement.[14] One of the early sticking points was the method of payment to the construction contractor.[15] The Joint Venture wanted payment in advance of construction but DOE would only authorize payment in arrears. Finally, on July 17, 1984, Hamilton sent a letter to Michelson informing him that the Joint Venture had agreed to payment in arrears.

The various agreements were all interrelated. The payment schedule for the construction contract was built into and controlled by the Milestone and Disbursement Schedule ("MDS") which was contained in the Servicing Agreement that was to be executed among the banks, DOE, and Agrifuels. The Joint Venture would not be a signatory to that agreement.[16]

The EPC contained a Construction Progress and Payment Schedule ("CPPS") which the contractor had to follow. This schedule mirrored the MDS. Both of these schedules called for a 21 month work and payment schedule. Harbert/Lummus wanted a change to the CPPS in order to work and get paid on an 18 month schedule. DOE, however, wanted a clause put into the EPC that would penalize the Joint Venture if the contractor failed to complete the project on time.[17] DOE would not have accepted the EPC if the penalty clause was not included. Wohadlo said the Joint Venture would only agree to the penalty clause if the EPC also included a bonus provision for early completion. DOE agreed and the EPC allowed for a bonus of $40,000 per day for every day the project was completed earlier than 21 months. The bonus was capped at $3.6 million, however. The bonus payment was to come from the savings on interest that would be avoided by completing the project earlier. DOE agreed to the bonus because it believed early completion would save money in the long run.

12. The lending banks included the Bank of New England N.A., Bank Fuer Gemeinwirtschaft AG, Bank of Scotland, Creditanstalt–Bankverein, The Golden State Sanwa Bank, Hibernia National Bank in New Orleans, and the Yasuda Trust and Banking Co., LTD.

13. The Bank of New England served as the agent bank for all the other banks.

14. In addition, section 22.2 of the EPC gave DOE a security interest in the EPC such that DOE could step into the shoes of Agrifuels as the owner and direct the contractor to act as if DOE was a party to the EPC agreement.

15. Another early problem faced by Agrifuels was a lawsuit filed by the Archer Daniel Midlands Company ("ADM") against the State of Louisiana. ADM argued on equal protection grounds that the tax exemption granted Agrifuels by the State for building the plant amounted to unfair protection of Agrifuels. DOE said the project could not go forward until the court ruled on the equal protection issue. Instead, Louisiana passed new legislation changing Agrifuels tax exemption to a tax incentive, thus making it available to others.

16. The MDS is located in Appendix A to the Servicing Agreement. The Servicing Agreement was signed by the Department of Energy, Agrifuels, and the lending banks, including the agent bank, Bank of New England, and the servicing bank, Hibernia National Bank in New Orleans. The Construction Progress and Payment Schedule and the Construction Work Breakdown Schedule for the contractor were part of the EPC. The only parties to the EPC were Agrifuels and Harbert/Lummus.

17. Michelson testified that it was actually the banks that had wanted the penalty clause inserted into the contract although DOE may have had a common interest in its insertion.

At this point, the Joint Venture also raised the issue of shortening the CPPS and MDS from 21 to 18 months.[18] While the 21 month schedule had been established early on during negotiations, Harbert/Lummus believed that it could build the plant safely and efficiently in 18 rather than 21 months and wanted to be paid on an eighteen month schedule. The Joint Venture was concerned that a 21 month schedule would leave it with a negative cash flow. DOE was not willing to change the schedule because of its concern that the contractor would get paid too early and then might not finish the plant in a timely manner.

Hamilton believed that the change from the 21 to an 18 month schedule would not lead to an increase in contract price and would in fact lead to interest and administrative cost savings.[19] DOE later estimated that the change from a 21 to an 18 month schedule would lead to a $2.5 million cost savings, even after a bonus payment to the Joint Venture for early completion.

Harbert/Lummus had to negotiate this change with Agrifuels, not DOE, because the Joint Venture was not a party to any agreements with DOE. Before Agrifuels would amend the CPPS, however, it wanted the MDS revised so it could apply for guaranteed funds from the bank group on an 18 month schedule. Even though the Joint Venture was the entity seeking the revision, it was only a party to the EPC, not the MDS. A change to the CPPS, therefore, depended on a change to the MDS. Thus, the change order request had to come from Agrifuels, not the Joint Venture.

Because negotiations continued right up to closing and because of the large number of separate documents, each having to be signed by various combinations of parties, the closing took place over a two day period, September 25 and 26, 1985, at the law firm of Donovan, Leisure, Newton & Irvine.[20] The documents were stacked along a large conference table for the parties to review and sign. As discussions progressed during the closing process, several of the documents were updated and amended. In addition, on several occasions the parties broke off into their own groups to discuss matters internally or to negotiate one on one with another party and so were not always in the conference room.

Both Hamilton and Wohadlo testified that in conversations during this two day period they specifically asked Michelson to change the language of the MDS to reflect the 18 month schedule.[21] According to Hamilton, Michelson stated that he would only amend the MDS after performance began under the MDS as drafted and then only if the contractor showed it was consistently ahead of the 21 month schedule. Wohadlo's recollection of that conversation was basically the same: if Harbert/Lummus could demonstrate it was on the 18 month schedule, then DOE would amend the schedule. In other words, Michelson would not amend the schedule prior to closing, but if the contractor consistently worked on an 18 month schedule, DOE would shorten the MDS to 18 months. It is this conversation that plaintiff alleges amounts to a promise to pay on an accelerated schedule if the contractor "consistently exceeded the schedule." Wohadlo testified that this statement was very important to the Joint Venture and that if it had not had DOE's assurances on this point it would not have signed the agreements. Michelson, however, testified that he never negotiated directly with

18. For ease of reference, because of their interrelationship, all changes to the CPPS sought by Harbert/Lummus and all changes to the MDS sought by Agrifuels will be referred to as changes to the MDS.

19. If the MDS had been amended to 18 months and the contractor had in fact finished within 18 months it would still receive the bonus payment. The contract provided that work would not be paid for until it was completed. Therefore, if the contractor finished in 19 months, it would receive a 2 month bonus, but would not receive the full final payment in month 18. If the contractor

took 21 months to complete the project, the contract funds would still be paid in 18 installments, but over 21 months, instead of 18.

20. Donovan & Leisure represented Agrifuels.

21. Wohadlo and Hamilton both recalled having a breakout session with Michelson during the pre-closing period. It was during this breakout session that according to plaintiff, Michelson agreed to amend the MDS if the contractor consistently exceeded the schedule.

anyone from the Joint Venture or the banks. All his negotiations were with Pat Hamilton from Agrifuels.

Michelson did state, however, that he remembers Hamilton's request to amend the schedule but that it was agreed that a decision could not be made on the amendment prior to the actual closing. According to Michelson, DOE did not have the resources on site to fully evaluate the change. Michelson recalled that either he or Doug Mitchell from DOE's General Counsel's office told Hamilton that Agrifuels should write up the proposal so DOE could evaluate the request when they had the resources available. He testified he never told Hamilton or Wohadlo that DOE would definitely approve the change.

James Brown, an attorney at the law firm of Schiff, Harden & Waite, was present during the closing process. He testified that he never heard Michelson or Wohadlo mention an agreement to amend the schedule prior to the actual closing.[22] Beckman concurred in Brown's recollection and stated that Michelson never told him that he had reached an oral agreement with Harbert/Lummus or Agrifuels to amend the schedule and that no such agreement was presented to the approving official.[23]

Brown further testified that such an agreement would be highly significant to all parties. Croyle voiced similar concerns. He heard no such agreement and explained that if he had it would have been significant because he would want to ensure that the changed payments were guaranteed as well. Such an agreement, according to Brown, would have required a revision of numerous documents and perhaps additional negotiations,[24] especially in light of the integration clauses in the contracts. Therefore, Brown

testified, if he had heard about such a side-bar agreement he would have counseled Michelson to put the agreement in writing. In addition, Brown stated that in this case any matters that arose just prior to closing were dealt with in writing, never through oral agreements.

The court finds that Michelson's version of these events—that he told Wohadlo and Hamilton that no decision could be made at that time on the request to amend the MDS—while not dramatically different than that of Wohadlo or Hamilton, is most reliable. The court finds that whatever conversations he had with Hamilton or Wohadlo during this pre-signing period, they did not include a specific commitment that DOE would amend the schedule automatically upon proof of acceleration by the Joint Venture. No declaration was made that irrevocably committed DOE to approving an altered schedule. It is simply too unlikely, given the concern at the closing for written expressions of commitment, that such a statement would have gone unremarked by Brown and Croyle or would not have been the subject of notes. The court is persuaded that Wohadlo and Hamilton simply read too much into Michelson's suggestion that Agrifuels should write up the proposal so DOE could evaluate it after closing.

In the event, as finally drafted, the MDS only authorized payment on a twenty-one month schedule, even if the project were to be completed in eighteen months. The draft Servicing Agreement was changed, however, to permit an amendment to the MDS to be made, but only with the consent of the Secretary of Energy or his designee. This was consistent with the overall role of DOE in approving all payments before the banks would disburse funds.[25] Croyle iterated this

22. Schiff, Harden & Waite represented the Department of Energy during the negotiations and closing of the Agrifuels deal.

23. The terms of the Agrifuels deal, as it was memorialized in writing, were presented to and approved by the Acting Director of the Office of Alcohol Fuels, Donna Fitzpatrick. As the approving official, Ms. Fitzpatrick's consent was necessary for the project to go forward.

24. Specifically, Brown testified that it would have raised questions as to the application of the

bonus provisions already incorporated into the agreement.

25. Amending the MDS would not have required the Government to guarantee any additional monies, it would simply have reallocated the guarantees from months 19, 20 and 21 to earlier months. According to Hamilton, prior to his pre-closing discussions with Michelson about changing the schedule from 21 to 18 months there was no provision in the contract documents to allow such a change. In response to

fact when he stated during the negotiation process that the banks would pay on the accelerated schedule, but only if DOE approved and guaranteed the payments.[26]

Also part of the closing documents were copies of all the relevant corporate authorizations for the project as well as copies of the government representatives' delegations of authority. Specifically, the documents included a delegation from David Newman, the Director of Procurement Operations at DOE,[27] to Michelson, authorizing him to sign the documents on behalf of DOE. One of the lending banks was still concerned, however, with Michelson's authority to bind the Government and asked for an independent opinion of counsel to be signed by someone at the DOE stating that Michelson did have the authority to bind the Government to guarantee the loans. An independent opinion was signed by the appropriate official at DOE and was made part of the closing documents.

During trial, there was extensive evidence as to this chain of authority within DOE. It began with a delegation of authority from then Secretary of Energy James B. Edwards to the Assistant Secretary of Management and Administration, Bill Heffelfinger. This delegation included the authority to:

> Hamilton's query, section 4.07 of the Servicing Agreement was added which allowed the MDS to be amended with the consent of the Secretary of Energy.

**26.** Since the EPC called for payment in arrears, at the end of the month Harbert/Lummus would determine how much work had been completed and the value of that work. It would then submit a payment request to Agrifuels who would incorporate these figures into its borrowing request. The borrowing request was then submitted to the construction monitor. The construction monitor verified that the indicated amount of work had been done and reviewed the request to make sure no work that was not authorized in that month was not paid for until authorized. The construction monitor then passed the borrowing request on to DOE for its approval. Once DOE approved the request, it would fax its authorization to BNE which had also received a copy of the request. Based on DOE's approval, BNE would tell Hibernia to disburse the money directly to the Joint Venture. It was not until disbursement that DOE was called upon to guarantee funds. The net effect of this procedure was that Harbert/Lummus would not be paid for its work for two months.

Enter into, approve, administer, modify, close-out, terminate, and take such other action as may be necessary and appropriate with respect to any procurement contract, sales contract, interagency agreement, financial assistance agreement, financial incentive agreement or other similar action binding the Department of Energy to the obligation and expenditure of public funds or to the sale of products and services. Such action shall include the rendering of approvals, determinations and decisions, except those required by law or regulation to be made by other authority.

The authority to enter into and modify agreements involving the Alcohol Fuel Programs was covered by this delegation. This authority was then re-delegated by Assistant Secretary Heffelfinger to Hillary Rauch, the Director of Procurement and Assistance Management.

On December 8, 1982, Rauch and Joseph J. Tribble, the Acting Director of Alcohol Fuels issued a delegation of authority to David Newman, the Director of Procurement Operations. The delegation, titled "Delegation of Authority with Respect To Loan Guarantee Agreement—Alcohol Fuels Energy Projects," gave Newman authority over awarded loan guarantee agreements.[28]

**27.** Newman was part of the Headquarters Procurement Division, which had procurement responsibility over the Alcohol Fuels Guarantee Program. Steve Michelson's contracting authority flowed through the Procurement Division. Nevertheless, the Procurement Division had to get approval from the Program Office before entering into loan guarantee agreements. The Program Office, however, was dependent on the Procurement Division to actually enter into the agreements. The Program Office had no independent contracting authority.

**28.** Specifically, paragraph A of the delegation authorized Newman to:

> 1. Perform post closing activities in accordance with Agreements, including the approval of disbursements. . . .
> 2. Negotiate the terms and conditions of modifications to Agreements. Modifications involving "extraordinary actions", shall require the approval of the Director [of the Office of Alcohol Fuels] and the concurrence of other appropriate Headquarters Elements, prior to any final action. For the purposes of this delegation, extraordinary actions are:

This document was followed up the next day by another document titled "Delegation of Authority." [29] This had the effect of superseding and invalidating a portion of the prior delegation. Newman was unclear as to why Ms. Rauch granted and then immediately revoked the authority in paragraph B. Newman was, however, certain that his authority under paragraph A remained.

This new delegation gave Newman the authority to:

enter into, approve, and take such other action as may be necessary and appropriate with respect to any contractual arrangement, interagency agreement, grant, loan guarantee, or other similar instrument committing the Department of Energy to (1) the expenditure of public funds or (2) the sale of products and services, pursuant to applicable laws, Executive orders, regulations, directives, policies, and procedures....

The approval of the Director, Procurement and Assistance Management Directorate (or designee), is required prior to entering into or modifying such instruments as set forth below:

....

3. With regard to loans, loan guarantees, price supports, guaranteed ... agreements, and all other such financial incentive instruments, actions with potential liabilities valued in excess of $50 million and, without regard to dollar value, actions that are defined as "extraordinary actions" in paragraph A of the above referenced contemporaneously executed Delegation of Authority on the condition that no award within your award authority is made without your prior approval or the prior approval of one acting for you in your absence. This authority may not be redelegated.

(a) those required in the event of termination of the Project, including those terminations pursuant to Agreements based on cost growth, schedule slippage, abandonment of the Project, or determination that the Project is not economically feasible;
(b) any waiver respecting an Event of Default;
(c) changes to the Agreements affecting the Government's first lien position, and having the potential of exposing the Government to liability or loss in excess of $1,000,000;
(d) reduction or withdrawal of the Guarantee;
(e) any other actions materially affecting the Government's rights.

The delegation also stated in paragraph B:

With respect to the Director, Office of Procurement Operations, the signatory authority and any of the other authorities described more

Thus, Newman's authority with respect to awarding Alcohol Fuel deals was limited to those actions that would cost the Government $50 million or less and those that were not "extraordinary actions." Newman, therefore, did not have the authority to enter into the original Agrifuels deal since it was worth over $50 million. He had to get transactional authority to enter into the Agrifuels contract.

On May 21, 1985, Newman sent a letter to his current boss, Bert Roth, the Director of Procurement and Assistance Management, requesting a one-time transactional delegation of authority to enter into the Agrifuels deal. In response, on May 23, 1985, Roth delegated to Newman the authority to "enter into, approve, and take such action(s) as may be necessary and appropriate to fully execute and close, ..., the Agrifuels Refining Corporation Loan Guarantee Agreement and related documents." The document went on to state, however, "The authority to enter into and take related actions may be redelegated, however, the transaction approval authority may not be redelegated." In other words, Newman could re-delegate the signing authority to Michelson but could not delegate

fully in DOE 5700.5, Chapter I, 1.j., necessary to process all transactions implementing Agreements, except for extraordinary actions, referred to in Section A.2 above, resulting in a modification to the Agreement. With respect to such extraordinary actions, the approval of the Director, Procurement and Assistance Management shall be obtained prior to executing any formal modifications of the Agreement.

29. The document began by stating:

This memorandum is effective immediately and supersedes the delegations to you of Contracting Officer authority dated June 17, 1982, and paragraph B of the Delegation of Authority with Respect to Loan Guarantee Agreements— Alcohol Fuels Energy Projects, executed contemporaneously with this delegation of authority.

the approval authority to Michelson or anyone else.

On September 25, 1985, prior to the closing of the Agrifuels deal, Newman sent Michelson his delegation of authority.[30] The memo outlining Michelson's new authority specifically referenced the delegation of authority Newman received on May 23, 1985. The redelegation was subject to certain expressed limitations:

> (1) This delegation of authority *does not* extend to those actions defined as "extraordinary actions"
>
> . . . .
>
> (2) This delegation of authority, in addition, for purposes of agreement administration, covers *only* those actions with potential liabilities valued up to and including but not exceeding $25 million.

(emphasis in original). This delegation gave Michelson the transactional authority to enter into the Agrifuels agreement as well as administration authority up to $25 million.[31]

All the documents were signed and the contract went into effect on September 27, 1985.[32] Work commenced immediately. Wohadlo and Brabham both stated that from the outset, the Joint Venture planned to perform on an 18–month schedule.

Construction progress was monitored on behalf of DOE by the construction firm of Heyward–Robinson, International. Heyward–Robinson's on-site representative was Tom Nikolich. Each month Harbert/Lummus would submit an invoice to Agrifuels indicating the amount of completion on the project. Agrifuels would then forward the invoice, along with its borrowing request to DOE. Concurrently, Heyward–Robinson would submit its own estimate of work completion to DOE. As long as the estimates coincided, DOE would authorize the servicing bank to disburse funds based on the level of completion.[33] If the level of completion exceeded that called for in the 21 month schedule, however, DOE would only guarantee payment on the amount authorized for the given month. The remaining amounts would have to be recouped in a later month. As things stood, Harbert/Lummus might complete a given percentage of the project earlier than scheduled but would not be paid for the work until the schedule so allowed.

Construction went relatively smoothly during the beginning of the project with few change orders required. Those that were required were approved by the contracting officer, Michelson. In accordance with the contract documents, all the participants attended quarterly meetings to discuss progress and any problems encountered.

Beginning in July of 1986, construction

---

**30.** The delegation stated:

> I hereby provide the following transaction approval and delegation of authority:
>
> (1) Based upon review of the draft Closing Report dated May 10, 1985, draft Loan Guarantee Agreement, related documents, and briefings received on the Alcohol Fuels Loan Guarantee Program—Agrifuels Refining Corporation Loan Guarantee Agreement is hereby approved for execution and closure on behalf of the U.S. Department of Energy.
> (2) The following authority is delegated to Mr. Stephen J. Michelson, being a duly appointed Contracting Officer.
> Mr. Michelson is hereby delegated authority to enter into, and take such other action(s) as may be necessary and appropriate to fully execute and close the Agrifuels Refining Corporation Loan Guarantee Agreement, and related documents on behalf of the U.S. Department of Energy. . . .
>
> . . . .

On that same date, Donna Fitzpatrick, the Acting Director of the Office of Alcohol Fuels, gave the Director of Procurement and Assistance Management, Newman's boss, the authority "to execute all necessary transaction documents and to subsequently execute the Guarantee in the form specified by such documents." This delegation was a necessary pre-requisite to Newman's receipt of authority and his subsequent delegation of authority to Michelson.

**31.** Defendant argues that Michelson did not have the authority to modify the MDS. The court notes that on at least one occasion a change order was later approved by Michelson reallocating funds from one month to an earlier month, thus changing the schedule. Pl.Ex. 65.

**32.** Approximately $102 million was available for the project. Of that amount, $88 million was to be lent by the banks and guaranteed by DOE. The remaining amount was to be provided by Agrifuels and its parent companies.

**33.** DOE's actual guarantee obligation did not come into effect until the servicing bank disbursed funds. If there was no disbursement there was no need for a guarantee.

began exceeding the 21 month schedule.[34] This prompted Agrifuels and Harbert/Lummus once again to raise the issue of amending the MDS. Hamilton testified that during July 1986 he had discussions with Wohadlo and Michelson about the amendment.[35] In response to Hamilton's statement that Agrifuels was going to submit the request to amend the MDS, Hamilton testified that Michelson responded, "[G]et all the documents together and get the construction monitor to approve it and we will look at it." A similar discussion took place between Hamilton and Michelson in August of 1986.[36] Again, Michelson stated that Harbert/Lummus should "get all the documents together[37], have the monitor sign off on it and then DOE would consider it." Wohadlo, however, also testified that he recalled Michelson responding that, "if Harbert/Lummus submitted all the required documents and the construction monitor agreed, DOE would approve the change." Michelson testified that he agreed to consider such a proposal, but denies having committed DOE to approving it. The court notes, in resolving this dispute, that Hamilton recalled at another point in his testimony that Michelson said, "Get the documents together, be sure the monitor signs off on it, and we'll process it." He did not recall Michelson specifically stating that DOE would approve it. Michelson's recollection coincided with Hamilton's testimony.[38] In addition, Ed Alper, the project manager at Harbert/Lummus, recalled Michelson stating

that if a change order was submitted, DOE would "process it." The court finds that Hamilton's statement is likely the most accurate rendition of what occurred.

On August 25, 1986, the Joint Venture submitted to Agrifuels a written request to modify the CPPS from a 21 month schedule to an 18 month one. Hamilton, however, was not entirely clear on what documentation was needed to support the requested amendment. Before he submitted the change order request to DOE he had numerous conversations with Michelson to discuss DOE's requirements for approval of the change.

A quarterly meeting was scheduled for September, 1986. Hamilton proposed that the MDS be considered along with construction progress. Alper recalled that when the topic of the 18 month schedule came up during the meeting, Michelson "urged the submission [of the change order request] and stated that the DOE was prepared to act positively to this request."

On September 30, after the quarterly meeting, Hamilton submitted a formal request on behalf of the Joint Venture to modify the CPPS.[39] The request contained the statement that, "Tom Nikolich [the construction monitor] agreed that the JV Contractor could *possibly* achieve Mechanical Completion by February 1, 1987." (Emphasis in original). Along with the formal request, Agrifuels submitted a revised MDS that showed the allocation of the monies in

---

34. Wohadlo testified that, from the outset, Harbert/Lummus intended to build the plant on an 18 month schedule so it could earn the early completion bonus.

35. Hamilton testified that he, Wohadlo, and Hamilton had informal face-to-face discussions in Louisiana to discuss the 18 month schedule.

36. There was conflicting testimony as to whether the July or August discussions were telephonic or held face to face. There is no dispute, however, that they actually took place.

37. It is unclear from the exhibits or the testimony presented what the required documents to approve the change order were.

38. While Michelson could not recall the specifics of the conversations, he did testify that his response was "write it up, submit, and we'll evaluate it."

39. Hamilton stated that he never heard anyone voice any opposition to acceleration and that in fact Michelson encouraged him to accelerate and told Hamilton that if he got the construction monitor to sign off on it, DOE would process Agrifuels' request for acceleration. He did not, however, explain his September 30 letter to Alper in which he states that Michelson had told him that DOE was not inclined to approve the change order.

Michelson does not dispute the fact that he did not oppose acceleration. He agreed that the contractor could accelerate performance but that Harbert/Lummus would do so at his own risk if the MDS was not modified. Without the modification, the contractor would still be paid on the 21 month schedule, regardless of its actual progress.

months 1 through 18, rather than 1 through 21. Hamilton sent a letter to Alper on the same date, however, which stated that "Steve Michelsen [sic] advised me on September 26, 1986 that DOE has not approved nor are they inclined to approve any request for extra payment by the JV Contractor in connection with acceleration of the 21–month completion schedule."

Nikolich sent a letter to Michelson on October 1, 1986, stating: "It appears the Contractor has the capability of completing his work three (3) months earlier than originally scheduled, which would result in their exceeding the cumulative percent of work to be completed for each of the remaining payments." Hamilton, as well as Ed Alper from the Joint Venture, also received a copy of this letter. At this point, the contract was at month 12 of the 21 month schedule. The Joint Venture's work was already 10 to 12 percent ahead of payments. Also, during this time Michelson was replaced as Contracting Officer by Thomas Keefe.

The documentation supplied by Agrifuels in its September 30 letter was inadequate according to DOE, however, and on October 10, Agrifuels requested that the Joint Venture submit an updated 18 month schedule. This letter, signed by Hamilton, stated that "DOE is also considering amending the 21–month schedule to an 18–month schedule in the near future." When asked at trial why he used the phrase "is considering amending" rather than will amend, Hamilton replied that it was "just [his] style." The court notes, however, that it is consistent with the tone of his September 30 letter to Alper.

Despite the need for additional documentation to support the September 30 request, DOE began evaluating the Agrifuels proposal. On October 10, 1986, Edward Rizkalla, the Senior Projects Engineer in the Financial Incentives Operations Division, sent an engineering assessment of the proposal to Keefe, the new contracting officer.[40] Rizkalla stated

that accelerated completion was possible but that he had several concerns, including impact of the acceleration on quality and safety, as well as the possible reduction in time for training and finding potential faults. Nevertheless, Rizkalla concluded, "Engineering approval for the acceleration of schedule is given with the reservations mentioned above."

On the same date, Rizkalla sent a letter to David Lindahl, the Director of the Program Office, in which he recommended that DOE approve Agrifuels' request for schedule acceleration. On October 14, 1986, Beckman concurred in the letter and on the same day Lindahl approved it.

Several meetings took place following the concurrences in Rizkalla's assessment of acceleration. According to Beckman, during these meetings information from other, unspecified, sources persuaded him to disagree with Rizkalla's earlier assessment. The only written record of this disagreement was in Keefe's October 21 letter to Hamilton stating that Agrifuels' September 30 request to amend the CPPS was under study and that the Department's response would be made after submission and review of an amended disbursement schedule. The letter also expressed the Department's concerns regarding the accelerated schedule.[41]

On October 22, 1986, Harbert/Lummus resubmitted a revised 18 month schedule to Agrifuels. This revised schedule included additional information to support its change order request.

Despite the fact that Keefe never signed the requested scheduling change order, beginning in November, 1986, references to an 18 month schedule began appearing in government documents. The November monthly status report on the project, prepared by Steve Grossman from the Program Office,[42] states, "The Department recently approved [Agrifuels'] proposed reduction in the con-

**40.** The DOE Engineering Assessment, undertaken after receipt of change orders, was a prerequisite to the granting of a change order to modify the construction schedule.

**41.** The official DOE file copy of this letter has concurrences signed by Rizkalla, the author,

Keefe, Jim Renjilian, of the General Counsel's office, Dan Beckman, and Steve Grossman.

**42.** Steve Grossman was a financial analyst who worked for the contracting officer. Part of his responsibilities were to prepare the status reports on the project.

struction schedule from 21 to 18 months." In a monthly status report prepared by Rizkalla, an attachment showing the total progress of the project states that it went "to an 18 month schedule in Sep[tember]." Similarly, in a memo to file from the Hibernia National Bank, Howard Blank refers to the project as on an 18 month schedule. There is no other indication that the CO had authorized the acceleration and DOE had yet to notify Agrifuels of its decision to approve or deny its modification request.

Throughout this time, Wohadlo became increasingly nervous that the Government was not going to process the change request. Moreover, Harbert/Lummus was even having difficulty getting paid under the 21–month schedule. The January progress payment, for work completed in November was not paid on time.[43] As of that time the construction monitor had certified that the project was 92.748 percent complete. When Wohadlo called Keefe to find out why the payment was delayed, Keefe responded that DOE was having problems with the banks but that there was no reason to worry about payment. Wohadlo also asked about the 18–month schedule change. According to Wohadlo, Keefe responded, "we're still working [on] it, but early completion will take care of everything." This comment caused Wohadlo greater concern. For the first time, he began to believe that the change would not be made, and that DOE was going to ride out the process until completion.

On January 7, 1987, Agrifuels once again submitted a formal request to change the MDS. The letter went on to state that this request superseded Agrifuels' earlier request for modification.

The next quarterly meeting was scheduled for February 5, 1987, in Washington, D.C. Agrifuels sent all the parties an agenda that called for a discussion of the 18 month revision. The meeting, however, was not held until the following week and took place in Louisiana rather than in Washington. By this time however, other problems had arisen. Triad America Corp., and Newedge, two of the parent companies of Edgington Oil,

which was, in turn, the parent of Agrifuels, declared Chapter 11 bankruptcy on January 27, 1987. This caused a great deal of concern at the meeting. Nevertheless, according to Hamilton, the 18 month revision was discussed. Hamilton testified that at the meeting, Tom Keefe assured him that DOE was working on Agrifuels' revision request and that it would be approved and the schedule modified to 18 months. There is no confirming or contrary testimony from Keefe because he is now deceased and he was not deposed prior to his death. The court finds, however, that it is unlikely that Keefe's earlier approach that "early completion will take care of everything" would have been abandoned so casually. It is more likely that Keefe, like Michelson before him, was trying to solve the issue of whether to accelerate payments by having it overtaken by events and that his statements, even if subject to misconstruction, were not intended, and should not have been received as contractual in nature.

When Triad and Newedge filed petitions for bankruptcy on January 26, 1987, an event of default under section 12.1(g) of the Guarantee agreement occurred. A formal declaration of default was not issued by DOE in January, however. Instead, on January 30, 1987, Agrifuels notified Keefe of a potential for default based on Triad's and Newedge's bankruptcy. Keefe contacted the bank group and DOE, and the banks and Agrifuels agreed that a waiver of the potential default would be issued. The default was waived for borrowing requests 17 in January and 18 in February. The default, however, was of a continuing nature and so had to be waived for each subsequent borrowing request.

Despite the waivers, there was still concern for the financial viability of the plant in the coming months. Triad had issued a corporate guarantee for the cost of the ongoing materials and there was concern that the new plant would not be able to generate money quickly enough to overcome the deficit left by Triad's bankruptcy. Neither Triad or Edgington could put up additional funds.

---

43. There was conflicting testimony as to when this payment was actually made. It is uncontro-verted that the payment was eventually made, but was made late.

On February 24, 1987, at the urging of Edgington, another meeting was held among representatives of DOE, the banks, Harbert/Lummus, and Agrifuels. Edgington sought the meeting to present a plan to restructure Agrifuels so that the project could continue despite Triad's bankruptcy. In addition, Agrifuels put additional pressure on DOE at the meeting to approve the schedule modification so that the plant could be completed before the money ran out.[44] At the February meeting, the lawyer for DOE, Michael Cohen, stated that DOE and Harbert/Lummus had a deal about changing the MDS and he was unsure why the schedule had not yet been changed.[45] According to Powers—the Joint Venture attorney—and Wohadlo, no one at the meeting, or at any time subsequent, disputed Cohen's statement regarding the "deal" between Agrifuels and DOE.

Wohadlo testified that he stated that before any restructuring of the obligations under the guarantee agreement, the change authorizing payment on the 18-month schedule had to be issued. The Joint Venture was concerned that without the change, the gap between the work it had done and the amount it had been paid would continue to grow. In response, according to Wohadlo, Beckman stated that "DOE was committed to funding the project to completion, and if the contractor completes the project, all the payments would work out in the end."

Beckman could not recall, but did not deny making such a statement. Croyle could not recall such a statement by Beckman, or anyone else, although he also could not recall if Beckman was actually at the meeting. Alper recalled the statement but thought it came from Keefe. Wohadlo testified that, on other occasions, Keefe had made the same offer

that, if the Joint Venture stayed on the job, DOE would fund the project to completion, although he could not recall any specific times.

The court believes Wohadlo's testimony that Beckman made the statement. The court attaches no significance to Beckman's failure to recollect it. Moreover, the court finds that Keefe was present when the statement was made, and did not question it.

Harbert/Lummus takes the position that this assurance of continued DOE involvement constitutes a contractually enforceable promise breached by the Government. Wohadlo testified that, but for Beckman's and Keefe's assurances that DOE would continue to issue guarantees through project completion, Harbert/Lummus would have stopped work immediately for failure to receive payment.

It was also during the February 24 meeting that BNE stated to Agrifuels that the banks would not disburse the February payment or any subsequent payments unless a guarantee was provided or payment made by Agrifuels on a $639,000 outstanding note. The banks went on to state that any additional disbursements would have to be guaranteed as well. Because of the bankruptcy of Triad, Agrifuels did not have the equity to guarantee the note. Instead, Hamilton asked Wohadlo if the Joint Venture could guarantee the note. BNE also said that they wanted Edgington to put up funding for all ineligible costs. Edgington did not have the equity to do this so Agrifuels asked the Joint Venture if they would fund this as well. There is no indication in the record as to what the Joint Venture's immediate response was to these requests.

Following the February 24 meeting, Wohadlo put his concerns in a letter, dated March

---

**44.** Agrifuels was worried that with bankruptcies of Triad and Newedge and the restructuring of Edgington it would be difficult to meet its capital obligations under the guarantee agreement. Agrifuels wanted to transfer some of the money it saved from cost underruns on certain line items to help fund cost overruns in other line items. The Government, however, took the position that even if Agrifuels was able to lower costs in one line item, it could not transfer the money saved to other line items. This disagreement was one of the major foci of the February 24 meeting.

**45.** The notes of Bill Powers, the Joint Venture's attorney, from the February 24 meeting show that Cohen stated that the "payment schedule was not [set] in concrete" and that DOE and the banks "assured that if construction was speeded up, milestone payment schedule would be changed." Furthermore, Cohen indicated that there was "no indication that DOE/Bank[s] would delay for months." Cohen did not testify.

3, 1987, addressed to all the participants.[46] As of that date, Agrifuels owed the Joint Venture $4.2 million. The letter stated:

> We have been building this plant on an 18–month construction schedule since work began. We have repeatedly requested in writing a change order to modify the 21–month payment schedule to the actual 18–month construction schedule. We understood at [the February 24] meeting that the DOE has reviewed and approved this change order, and it is on the Secretary's desk for signature.
>
> Neither the DOE nor the Servicer will commit as to when this change order would be signed by the Secretary. We have never been told that the change order would not be signed and that the Owner, Servicer, or Secretary was not interested in the early completion of this project. We agreed to a 21–month payment schedule only after the assurances of Agrifuels and the Servicer that there would be no problems modifying this to an 18–month pay schedule if such progress was actually obtained. In reliance upon that assurance, we accelerated construction on an 18–month basis. The Construction Monitor has certified that this accelerated construction has been accomplished! However, for some reason, the Owner,[47] Servicer, and Secretary have not agreed to a change order as promised, in spite of the fact that the DOE and Servicer at Tuesday's meeting authorized early disbursement of start-up funds in recognition of the early completion. This approaches bad faith on the part of the Banks and DOE to the Contractor. We expect the DOE to approve the revised schedule and to pay the difference between the actual completion versus the 21–month schedule by an interim disbursement no later than March 15, 1987.

The letter went on to state that the Joint Venture was aware that Agrifuels was in default of the loan agreement and that Agrifuels might not be able to further fund the project. The Joint Venture, therefore, notified the parties of its intent to stop work if it was not paid what it was then owed.

Harbert/Lummus did not receive the February progress payment on time. Brabham testified that by this time the Joint Venture was considering stopping work immediately. Wohadlo called either Keefe or Dave Erdman[48] at DOE to find out why payment had not been sent. He was informed that DOE was still having "trouble" with the banks, but that the payment should be coming soon.[49] Wohadlo asked about the 18–month schedule. The DOE representative responded, "you're almost complete, when you finish, everything will be caught up."

On March 4, Wohadlo spoke with someone at DOE and was told that DOE's "upper management" had decided not to amend the MDS. On March 9, Wohadlo sent a letter to Agrifuels, DOE, and BNE stating that the January progress payment was overdue and threatening to stop work within five days. Harbert/Lummus received no direct response to this letter, although Wohadlo testi-

---

46. The letter was addressed to Pat Hamilton with copies to Edgington Oil, Donovan & Leisure, Lummus Crest, the construction monitor Tom Nikolich, the Secretary of Energy, Ralph Benko, and Thomas Keefe at DOE, James Croyle at BNE, and the Hibernia National Bank.

47. Wohadlo stated that he included the owner here because he could not negotiate directly with DOE because his contract was with Agrifuels, not DOE. He was aware that Agrifuels agreed with the Joint Venture's change order request.

48. Erdman was a contract specialist in the Financial Incentives Operations Division. He reported directly to Tom Keefe. Erdman replaced Steve Grossman on the Agrifuels project in January 1987.

49. The banks stated in early March that they would not disburse any additional funds unless the entire amount of Note C was guaranteed by Agrifuels or another party. There were three notes involved in the project. Note A involved the 90 percent share of disbursements guaranteed by DOE. Note B amounted to 5 percent of the disbursement and was guaranteed by letters of credit put up by Agrifuels and its parent companies. Note C was the remaining 5 percent of the disbursement. Under the guarantee and credit agreements, this note was not supposed to be guaranteed. DOE wanted this provision so Agrifuels would have some financial exposure if the project failed. After the banks said they would no longer disburse funds without a guarantee on Note C DOE acquiesced on this requirement. The entire amount of Note C comprised several million dollars.

fied that the January progress payment was released shortly thereafter.[50]

The Government did, however, authorize $1.8 million to be moved from months 20 and 21 to month 17 to pay for start-up costs. This was necessary because by month 17 the plant was near completion and the Joint Venture was preparing for start-up. This amount was put into an escrow account at Hibernia and was used to pay the suppliers of the start-up material directly. The money did not go through Agrifuels. Instead Agrifuels was to purchase the material from suppliers and at the end of the month the suppliers would be paid out of the escrow account.

On March 13, 1987, Keefe notified Agrifuels in writing that DOE would not approve an amendment to the MDS. Keefe wrote that the Joint Venture had undertaken the decision to accelerate unilaterally out of a desire to receive the bonus payments, not because of a promise to accelerate. According to Keefe, "there [was] neither [a] legal nor equitable obligation on the part of the Department to grant th[e] [change order]." The letter also iterated the Department's position that cost underruns on one line item could not be transferred to another line item to counter cost overruns.

At some point, Harbert/Lummus had responded affirmatively to Agrifuels' earlier inquiry concerning whether the Joint Venture would partially assume Agrifuels' outstanding obligations to the banks. It would only do this, however, if Agrifuels and DOE met certain conditions. The proposal was discussed in a March 24, 1987 telephone conference between Powers and Croyle of BNE. Croyle stated that the Joint Venture's proposals had "piqued" DOE's interests and that DOE might informally be willing to guarantee more funding in return for Harbert/Lum-

mus performing the additional obligations discussed below.[51]

On the same date, Agrifuels submitted borrowing request 19. Agrifuels was still in technical default of the guarantee agreement. A waiver was requested but never issued by DOE or BNE for this borrowing request and the request was not honored by Hibernia. Harbert/Lummus has never been paid for the work authorized and completed under this request.[52]

Despite the fact that DOE had formally denied the acceleration request, a meeting was held in New Orleans on March 26, to discuss once again the 18 month proposal. Representatives of Harbert/Lummus, Agrifuels, DOE, BNE, and Hibernia attended. Agrifuels and the banks agreed that the schedule should be changed to 18 months. Despite its earlier rejection, DOE announced that it could not take a position at that time and that further discussions were needed.

On April 7, 1987, the Joint Venture responded in writing to Agrifuels' request that Harbert/Lummus guarantee a portion of the outstanding obligation to the banks. The letter expressed a willingness to assume substantial responsibility for guaranteeing or funding the balance of the project, but would only do so if certain conditions were met. One of these conditions was payment in full for all work completed and a draw down of the remaining funds into an escrow account. The letter further stated that if the Joint Venture was not paid what it was owed by April 15, it would stop working.

Agrifuels responded to the Joint Venture's April 7 letter on April 8, with a counteroffer, agreeing to some of the Joint Venture's demands and rejecting others.[53] Agrifuels'

---

50. Croyle stated that the reason for the delays in payments was that, because Agrifuels was in default of the agreement, waivers had to be obtained from all the lending banks. These waivers, according to Croyle, often took time to process.

51. This statement came from Croyle, however, not DOE and so cannot be attributed to DOE.

52. The total request was for $15,039,583.59, of which $2,248,038.08 would be met by Agrifuels' equity contribution. The remaining amount was

to be paid by the banks and guaranteed by DOE. The borrowing request also contained Harbert/Lummus' request for payment of $7,000,-035.00, however, only $2,466,295.00 of that amount was authorized by the construction monitor as payable. The remaining amount was for work that was completed, but was not recoverable until later months.

53. Agrifuels accepted Harbert/Lummus' proposals on the reimbursement of sales tax, the payment for syrup and molasses, approval and payment of change orders 11 and 13, the payment of

counteroffer required the Joint Venture to accept the new terms by the close of business the following day. Agrifuels stated that it was very interested in completing the project but that if Harbert/Lummus did not accept Agrifuels' terms, the project would not receive any additional funds.[54]

Also on April 8, Croyle sent a letter to Hamilton in which he discussed a letter BNE had received from Edgington in which Edgington indicated that the project was no longer economically viable and that Agrifuels should abandon it.[55] In his letter, Croyle reminded Hamilton that Agrifuels was still contractually required to meet its obligations under the Guarantee Agreement and that if it failed to do so the banks would take legal action.

In the wake of the Agrifuels' response to his earlier letter, Wohadlo requested that the parties meet on April 9 to discuss the Joint Venture's proposal. Wohadlo testified that the meeting was intended to be a four-way negotiating session that would result in a restructuring of the obligations that Agrifuels' parent chain could not fulfill. Hamilton agreed and called a meeting of DOE, the banks, Agrifuels, and the Joint Venture.

In preparation for this meeting, Beckman, Keefe, Donna Fitzpatrick, and several other DOE staffers met with Under Secretary of Energy Joseph Salgado at DOE headquarters in Washington, D.C. to discuss the future viability of the Agrifuels project. During that meeting, Keefe stated that if the MDS became a sticking point in the negotiations, DOE should give on this point if it was a deal breaker.[56] His notes of the meeting state that DOE was proceeding on the understanding that the Secretary had decided to continue the project. At this point, the Office of Procurement had projected that the cost of shutting down the project would be more than the cost of completing the plant.

At the conclusion of the meeting Under Secretary Salgado stated that he would meet with Secretary of Energy John Herrington while Beckman and the others met with the project participants. Salgado would inform Beckman later of the Secretary's decision on whether or not to continue the project.

Later that morning, representatives from all the relevant parties met at DOE to discuss the progress and future of the project.[57] There had been ongoing negotiations between the Joint Venture and Agrifuels about restructuring the obligations of Agrifuels' parent chain. At that point Harbert/Lummus still had not received its February Progress payment.[58] Despite this, Wohadlo testified that the meeting was going well, and was one of the better meetings the group had had for quite a long time. Beckman agreed with this assessment. At some point, however,

---

interest on several late payments, the payment of several eligible and ineligible contract allowance items, an extension of the completion date for every day of delay in caused by Agrifuels, the terms of the repayment of Harbert/Lummus' letter of credit on Note "C" and the granting of a second mortgage to Harbert/Lummus for any monies loaned to Agrifuels. Agrifuels stated that it could not accept Harbert/Lummus' demand for payment for actual progress to date, an escrow of the remaining funds, the payment of change orders 8 and 10 which were rejected by DOE and the payment for waste water treatment plant seed and feed. Agrifuels also stated that it would not accept liability for Edgington Oil's obligation to repay Harbert/Lummus' loan or Harbert/Lummus' proposal to participate in any Agrifuels decision relative to Edgington Oil or the use of Agrifuels funds to repay the Joint Venture's loan to Edgington Oil.

54. As stated above, the bank group had informed Agrifuels that it would loan no more money without additional obligations to cover the re-

maining ten percent. If Harbert/Lummus did not provide this guarantee, Agrifuels had no alternative to receive funding and the project would have to be halted.

55. Edgington had earlier agreed to buy portions of the ethanol output of the completed plant. Edgington's letter of March 23, 1987, stated that it would no longer meet its obligations under this agreement.

56. This is reflected in Keefe's meeting notes.

57. In attendance were Beckman, Keefe and one or two others for DOE, Wohadlo and Alper for the Joint Venture, Harbert's in-house counsel Bill Clower, Lummus' in-house counsel, Gerry Kaye, and a representative of the Bank of New England.

58. There was also testimony that at this point the January progress payment had not yet been released. As stated above, the court makes no finding as to when the payment was released.

Beckman was called away to meet with Salgado who informed him that the Secretary had decided that the project was no longer economically feasible and that the Department was no longer going to guarantee funds for the project.[59] Beckman returned to the Agrifuels meeting and spoke with representatives from each party individually. In these individual meetings he informed them of the Secretary's decision to discontinue the funding guarantee. When Wohadlo asked about payments the Joint Venture was owed, Beckman could not provide an answer.

In a later memo to the Agrifuels credit file, Howard Blank from the Hibernia National Bank wrote:

> The Department of Energy (DOE) halted construction funding at the close of business Thursday, April 9, 1987. . . .

> The Bank Group was willing to continue funding before the DOE announcement, provided all future fundings were guaranteed or cash collateralized. . . . The Bank Group's goal was to get the plant mechanically complete and past the performance/acceptance test in order to give it a chance to operate.

> The contractor was reportedly prepared to put up a letter of credit to secure the unsecured 5% going forward. However the DOE mysteriously stopped the project. They had always voiced their desire to build out the plant when the Bank Group previously visited the continuation of funding issue. This made sense because, as the potentially largest creditor, a complete and tested plant would be more valuable to them in a liquidation scenario.

During trial, Beckman agreed that DOE had in fact voiced its desire for the Joint Venture to build out the plant because it would be more valuable than an uncompleted plant. He denied, however, ever stating that DOE would continue its guarantees on the plant.

At the time the funding guarantee was terminated, much of the plant was already in the hands of the operational staff and ethanol was being produced. Only punchlist items remained. Ethanol production had begun in late March and continued until Hamilton finally shut the plant down on April 10. According to Hamilton, at the time of shut down, 20,000 gallons had been produced and the plant was only days away from actual start up.[60] The plant was less than two weeks away from the performance test that presumably would have led to acceptance by the Government. The certificate of mechanical completion for the plant was issued on April 15, 1987. Brabham testified that the plant would have met the acceptance test requirements by April 30, 1987.

On June 9, Keefe sent a letter to BNE requesting that the banks not take action to demand immediate repayment of the guaranteed loans from Agrifuels. Keefe requested a deferral so that the parties would have time to come up with a viable way to complete the project. The banks agreed.

According to Beckman, the parties discussed several alternatives to keep the project alive. None of these options proved viable, however. DOE then contracted with Harbert/Lummus directly to shut down and maintain the plant.[61] On August 7, 1987, DOE sent Agrifuels a letter formally notifying it that it was in default of sections 12.1(a), 12.1(g) and 12.1(i) of the Guarantee Agreement. This notification stated that the Government would no longer guarantee any additional funds and its guarantee would be limited only to those funds already outstanding. The reason for the delay between the April announcement of termination of future guarantees and the formal August default was that in the interim there were ongoing discussions among Agrifuels, DOE, and the

---

59. Keefe had, however, authorized a change order the previous day for $69,160.00, bringing the contract price up to $80,385,460.00.

60. The ethanol produced, however, was only a pre-seed mixture and was not the type of ethanol that would finally be produced at the plant and the type necessary to pass the performance test. According to Wohadlo, however, the pre-seed

mixture was a necessary pre-cursor to making the required type of ethanol.

61. This was a separate contract that lasted approximately 7 months. Harbert/Lummus was paid for its work in advance. DOE later contracted with H.R. International to be the long-term caretaker of the plant.

banks to try to work out ways to continue funding the plant.

On August 11, Agrifuels received another letter from DOE declaring that the principal amounts of all guaranteed notes, together with all accrued interest and all other amounts owed to the United States, were immediately due and payable. These monies were never repaid by Agrifuels.

The Government took over the plant a year after default. At some point, Agrifuels offered to buy the plant for $12 million in cash and a first mortgage on the remaining amount but the Government refused. DOE was unable to sell the property as a working ethanol plant and eventually sold the plant for scrap for approximately $3 million. According to Erdman, DOE, under the terms of the guarantee agreement, paid the bank consortium "somewhere in the neighborhood of $70 million."

The Joint Venture had submitted payment requests 17, 18, 19, and 20, which were in turn included in Agrifuels borrowing requests 18, 19, 20, and 21 respectively. Of these, Harbert/Lummus was only paid for a portion of payment request 17.[62] Agrifuels never paid the Joint Venture for work done in February, March, or April 1987. As of payment request 20 in April 1987, the construction monitor certified that the plant was 99.039 percent complete.

## DISCUSSION

Recognizing that there is no privity of contract established between DOE and itself in any of the written agreements, Harbert/Lummus alleges that DOE on either of two occasions orally obligated itself directly to the Joint Venture to approve the acceleration of the MDS if construction progressed on an 18–month schedule. If the payment schedule had been accelerated, then Harbert/Lummus would have been eligible for payment corresponding more closely to its actual work. It also contends that a separate

contractual relationship was formed later between the two entities when Keefe and Beckman represented that DOE was committed to guaranteeing funds through the completion of the project. The Joint Venture contends that, but for this assurance, it would have ceased work.

The Government denies that any of these promises were made. Furthermore, it argues that even if they were made, under the regulatory scheme involved, an oral statement is not sufficient to bind the Government. Lastly, the Government argues that none of the individuals had the authority to bind the Government to such agreements. For the reasons set out below, the court concludes that DOE never obligated itself contractually to amend the MDS. It does conclude, however, that DOE made a binding, unilateral[63] offer to Harbert/Lummus to continue guaranteeing loan installments in exchange for the Joint Venture's continuing to work on the project.

*Amending the Milestone Disbursement Schedule.*

A contract with the Government, whether express or implied-in-fact, is established by showing: (1) a mutual intent to enter into a contract; (2) a lack of ambiguity in the offer and acceptance; (3) the authority to contract on the part of the government agent whose conduct is relied upon; and (4) consideration. *OAO Corp. v. United States,* 17 Cl.Ct. 91, 98 (1989) (citing *Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed. Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985)); *Truckee–Carson Irrigation Dist. v. United States,* 14 Cl.Ct. 361, 370, *aff'd,* 864 F.2d 149 (Fed.Cir. 1988) (table). The alleged agreements to alter the MDS are challenged by the Government on the first three of these elements. It is unnecessary to consider all of the asserted deficiencies, however, because the court is persuaded that the alleged contracts founder on the first two.

**62.** Harbert/Lummus was paid the full authorized amount of payment requests 1 through 16. However, in some instances, the Joint Venture may have performed work in one month that was not authorized until a later month.

**63.** A unilateral contract can arise "where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance...." *Lucas v. United States,* 25 Cl. Ct. 298, 304 (1992) (citing *Simmons v. United States,* 308 F.2d 160, 164 (4th Cir.1962)).

With respect to the pre-closing conversations, the court has previously found that Michelson did not specifically state to Hamilton or Wohadlo that DOE would approve the change request. The court finds it most likely that Michelson only committed to considering the request, once made, after performance began. He told them that DOE did not have the resources on site to evaluate the proposal and that Agrifuels should submit a formal proposal after closing. These statements cannot be characterized as an unambiguous offer to amend the MDS; they do not express an intent to bind DOE to amend the schedule, even if the Joint Venture was certified to have accelerated.

Moreover, given the context of the closing, it is unlikely that there was a mutual intent to enter into an obligation separate from all the other documents. As the court in *OAO Corp.* wrote, "where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied. 17 Cl.Ct. at 99 (citing *Pacific Gas & Elec. Co. v. United States,* 3 Cl.Ct. 329, 339 (1983), *aff'd,* 738 F.2d 452 (Fed.Cir.1984) (table)). While in this case there was no writing executed as between DOE and Harbert/Lummus, the parties' rights and obligations were nevertheless captured in written agreements executed contemporaneously with these statements. Those other documents had been, and continued to be, the subject of negotiation involving both DOE and the Joint Venture. The logical place to have captured the substance of what Harbert/Lummus was seeking was either in the MDS itself or in a separate document executed contemporaneously. The obvious reason neither was done is that there was no agreement to accelerate automatically upon the monitor's certification. While Michelson may have unduly encouraged the Joint Venture, the court believes that he was content to postpone the problem with vague assurances of future consideration of altering the schedule. If the plaintiff needed more assurance, it should have insisted on a written agreement as part of the closing.

Moreover, the fact that the Servicing Agreement was amended during closing to accommodate a future request for acceleration is significant. It suggests that the modification represented the substance of the parties' agreement with respect to acceleration.

The alleged promise made in late August 1986 to accelerate the guarantee and payment schedule suffers from a similar infirmity.[64] The statement that DOE would "process" the proposal to accelerate does not constitute an unambiguous expression of intent on the part of DOE to amend the MDS. The parties understood that, regardless of what Michelson may have said, acceleration required a signature by someone at the CO level or higher. Even Wohadlo recognized as late as March 3, 1987, that approvals by the requisite authorities within DOE were necessary and had not yet been given. Although the word "process," may, in the right context, include an implication of approval, it could not objectively have been construed that way under these circumstances. Michelson committed the agency to considering whatever the Joint Venture and Agrifuels proposed. While his comment was no doubt intended to encourage hope in the hearers, it simply did not carry the gravitas of a contractual representation. It may have been motivated by an intent to placate or postpone, but not by an intent to bind the Government.

The court notes finally that in his letter of March 3, 1987, Wohadlo summarized the earlier representations in the following telling way: that the Joint Venture only agreed to the 21–month payment schedule "after the assurances of *Agrifuels and the Servicer*" that there would be no problems changing to an 18–month pay schedule if such progress was actually obtained. (Emphasis added). Such assurances may have come from those sources, but they were not made by DOE.

The Joint Venture also contends that later, after Beckman and Lindahl concurred in Rizkalla's engineering recommendation to amend the MDS, Keefe's failure to sign off on the change was an abuse of discretion and

---

**64.** Wohadlo testified that the face to face meeting in Louisiana occurred in August, not July as Hamilton testified. Whether the statements were made in face to face meetings or telephonically is not relevant to the more general inquiry of what exactly was said.

violates Section 5700.5 of the agency's internal regulations. That section states, in part: "The contracting officer will take contractual steps consistent with the program office's decision and the contractual terms and conditions." Plaintiff contends that Lindahl and Beckman's concurrences constitute Program Office approval, and hence Keefe had no had no choice but to sign off on the change order.

The court disagrees with plaintiff's analysis. While the Program Office had authority to direct the CO to make contract changes, it is the CO who acts for the agency with respect to the outside world. The Program Office has no contracting authority. Accordingly, if the court assumes that the Program Office had officially instructed the CO to take some action, Keefe may have run afoul of section 5700.5, but only as a matter of internal agency policy. Violation of that section would not amount to a breach of contract as against plaintiff. Moreover, there is no reason to think that the Program Office position had been formalized to the point that section 5700.5 was implicated. The plaintiff was never officially notified of a "Program Office" position. Beckman testified that, subsequent to seeing the engineering assessment, he attended a meeting in which additional information about the change order was presented and that this additional information caused him to change his mind and decide against approving the change. The court holds that Beckman's and Lindahl's concurrence in the engineering assessment did not constitute the agency's approval of the change or obligate the CO to approve the change order.[65]

*Funding the project through completion.*

■ The court has found that, during the February 24 meeting, Beckman stated that DOE was committed to "funding" the project through completion if the Joint Venture did not follow through on its threat to walk off the job. The court has also found that Keefe was present when that statement was made. It finds here that Keefe's silence amounted to an adoption of Beckman's statement. It is also clear that Beckman, and thus Keefe, intended Harbert/Lummus to act on the representation, and that Harbert/Lummus relied on it. The court believes Wohadlo's and Hamilton's testimony that, in the absence of Beckman's assurance, the Joint Venture would have quit work altogether. Harbert/Lummus thus accepted DOE's unilateral offer and simultaneously gave valuable consideration by staying on the job.

■ As this court has previously stated, "[t]here is ample case law holding that a contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reliance thereon." *Wells Fargo Bank, N.A. v. United States,* 26 Cl.Ct. 805 (1992), *aff'd in relevant part,* 88 F.3d 1012 (Fed.Cir.1996). "Thus, where a unilateral contract is at issue, the fact that only one party has made a promise does not imply that a contract does not exist. A contract comes into existence as soon as the other party commences performance." *Id.* The Restatement (Second) of Contracts summarizes the relevant case law as follows: "Where an offer invites an offeree to accept by rendering performance ... an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it." *Id.* at § 45(1).

There is no question in the present circumstances that promissory words induced performance by Harbert/Lummus. There are, however, a number of factors that complicate resolution. The court notes initially that Beckman's statement cannot be construed literally as a commitment to fund the project. The plain import of the words is that DOE would live up to its contractual obligations, but those did not include funding. The Government had originally obligated itself to partially guarantee monies advanced by the banks, not to furnish construction funds itself. Beckman was, in effect, telling Harbert/Lummus that, if it continued to build the plant, DOE would honor its commitments to the banks to guarantee 90 percent of the monies they advanced.

Unlike a typical guarantor, the Government was involved at two points, both before

---

**65.** Beckman also testified that it was common practice to hold meetings to discuss change orders after the engineering and other assessments had been received.

and after the advance of monies. After Agrifuels submitting a borrowing request, prompted by a payment request from the Joint Venture, the construction monitor was required to certify work according to the original schedule. Only after DOE approved the request would it go to the banks. DOE's duties with respect to guaranteeing a particular installment of loans would not arise until the disbursement had been made by the banks.

There is no basis for concluding that DOE defaulted in its obligations with respect to borrowing requests for February and March. Its approval of advances with respect to work due to be paid for according to the 21 month schedule was sent to the banks. Those loans were held up because BNE informed Agrifuels that the banks would not disburse any additional funding unless the unsecured and unguaranteed 10 percent was supported by additional guarantees or collateral. This was in response to a letter the banks received from Newedge, one of Agrifuels' corporate parents, which stated that Newedge would no longer live up to its obligation to guarantee 5 percent of the unsecured amount.

It is important to note also what Beckman and Keefe did not promise. They did not, as Harbert/Lummus suggests, agree on behalf of DOE to assume Agrifuels' direct obligation to the Joint Venture to pay for past or future work. They only obligated DOE to continue the Government's role as guarantor of future borrowing requests.

Secretary Herrington announced in April that no new funds would be guaranteed. On the face of it, this appears to be an anticipatory repudiation of DOE's commitment to Harbert/Lummus that it would not renege on it obligations as guarantor. Although no grounds were officially announced at the April meeting, the formal default of Agrifuels in August cited provisions of the guarantee agreement relating to the following default events: the bankruptcies of the parent corporations, a judgment against Agrifuels or one of its parent corporations, and failure of

Agrifuels to pay some of its notes to the banks.

There can be no doubt that, as between Agrifuels and DOE, the agency was, for aught that appears, within its contractual rights in withdrawing from the guarantee commitment. The bankruptcies and judgment against Triad gave grounds for DOE to default the contractor. While those bases for default had been waived for January and February, those waivers would not preclude the agency from acting in April.[66]

Another fact has to be considered. With respect to the additional work Harbert/Lummus did after February 24, DOE was never put into the position of having to meet its obligations to Agrifuels under the guarantee contract. The work had not been reached on the MDS. As DOE was well aware, the Joint Venture was substantially ahead of schedule with respect to completing the work. Barring a change to the MDS, that work could not yet support a payment or loan request. Although the point is not argued by the Government, the court has to consider the fact that Agrifuel's threats in early April to abandon the project, as well as the banks' related threats not to advance any additional monies, may have meant, even absent the DOE's announced withdrawal of further guarantees, that DOE may never have been called upon to guarantee loans to pay for that as-yet-unscheduled work.

■ The question thus becomes, did the agency commit itself to answer to Harbert/Lummus in contract damages even if DOE's refusal to guarantee further loans was a legitimate exercise of its rights against Agrifuels under the guarantee agreement? Or, to state it differently, could the Government create a side-bar agreement with Harbert/Lummus independent of its rights to default Agrifuels? The court holds that it could and did.

The court is persuaded that a promise to the Joint Venture not to suspend the guarantee can be enforced independently of DOE's rights against Agrifuels. DOE was under no

66. A formal default was not declared until August. The court does not view that fact as determinative of DOE's obligations as against the Joint Venture. If announcing a cessation of guarantees was a breach of a separate obligation to Harbert/Lummus, the latter was nevertheless on notice at that point that further effort would be at its own risk.

prior obligation to make such an independent commitment directly to the construction contractor, with whom it had had no prior contractual relationship. The statement was obviously made for the sole purpose of trying to salvage the entire project. Beckman's and Keefe's words were intended to induce Harbert/Lummus to continue working, and they did. The court views these facts as analogous to those in *United States v. Winstar Corp., et al.,* —— U.S. ——, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), where the Court found that, although the Government had not contracted away its sovereign powers, it had obligated itself to answer in damages in the event it acted inconsistently with binding promises. Here, DOE retained the power to exercise its rights against Agrifuels, but it promised Harbert/Lummus that, if the agency did so, it would compensate the Joint Venture for any detrimental reliance.

The court notes, moreover, that at the same time Beckman and Keefe were trying to induce the Joint Venture to stay on the job, they knew of the bankruptcies of Agrifuels' parent corporations, of the banks' threats to withhold future funding, and of the judgment against Triad. The promise to Harbert/Lummus not to withdraw the guarantee was thus made with an understanding of those events. The court finds that the commitment was, as to Harbert/Lummus, not subject to any rights DOE might have had against Agrifuels arising out of the bankruptcies or the banks' threats to withhold further advances. The only arguably different ground asserted by the agency in August was Agrifuels' default on notes to the banks and that circumstance is obviously factually linked to the banks' previously expressed ultimata.

Finally, the court holds that there is a causal link between breach of the promise and damages. The offer did not invite a promissory acceptance. It was accepted by performance. DOE knew that, irrespective of what the future held, Harbert/Lummus

would, if it accepted the offer, incur costs which potentially would never be the subject of a borrowing request the Government would be obligated to guarantee. Moreover, the evidence suggests that the actual participants in the April meetings were optimistic that an agreement would be reached to salvage the project.

In any event, there is no question that, whatever other pitfalls to project completion might have been ahead as of April, after Secretary Herrington's announcement, the prospects for completion were suddenly zero. The court holds that the Government cannot argue that Agrifuels and the banks would never have prompted a call for further Government guarantees. By preemptively withdrawing its promise to guarantee further loans, it waived that potential argument. The court holds that, absent some other affirmative defense, DOE is liable to Harbert/Lummus for the value of the additional work performed in reliance on the broken promise.

*The Authority Question.*

 The Government asserts that none of the relevant actors had authority to enter into the alleged agreements. It correctly points out that the Government is not bound by the acts of its agents beyond the scope of their actual authority. *Prestex, Inc. v. United States,* 3 Cl.Ct. 373, 377 (1983), *aff'd,* 746 F.2d 1489 (Fed.Cir.1984) (table) (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)). In addition, "anyone entering into an arrangement with the [G]overnment takes the risk of having accurately ascertained that he who purports to act for the [G]overnment stays within the bounds of his authority." *Id.* Thus, the burden is on the plaintiff to prove that Keefe had the authority to make the offer.[67] *Shearin v. United States,* 25 Cl.Ct. 294, *aff'd,* 983 F.2d 1085 (Fed.Cir. 1992) (table). The fact that Wohadlo may have believed Keefe had sufficient authority is irrelevant.[68] It must be shown that the

---

**67.** As stated above, the court finds that Keefe was present when Beckman made the statement pledging DOE to guarantee future funding. His acquiescence to this statement amounts to a ratification of the promise made. Therefore, only

Keefe's authority to make the statement need be analyzed.

**68.** The Government is also bound by implied actual authority, however. *Miller Elevator Co.,*

CO actually had the requisite authority for plaintiff to prevail. *See Edwards v. United States*, 22 Cl.Ct. 411, 421 (1991). For the reasons set forth below, the court holds that the plaintiff has met its burden.

■ After Michelson was replaced by Keefe, Newman had to issue a new delegation of authority. By this time, all the loan guarantee agreements had been executed and all that remained was the administration of the three on-going projects.[69] Specifically, he gave Keefe the authority to administer all three agreements and enter into any actions with potential liabilities valued up to and including, but not exceeding $50 million.

The Government argues that Keefe did not have the authority to promise that DOE would fund the project until completion because doing so would constitute an "extraordinary action" for which Keefe had no authority. One of the definitions of an "extraordinary action" is an action that constitutes a waiver respecting any default or termination. Specifically, the Government argues that by promising to guarantee funding until completion, Keefe was in effect promising to waive all of Agrifuels future defaults. Doing so would require the approval of the Director, Procurement and Assistance Directorate, David Newman's boss. Without this approval, therefore, the Government argues that Keefe did not have the authority to promise that DOE would guarantee funds for the project until completion.

While a waiver of rights to default may have exceeded Keefe's authority, the court has already held that was not the substance of the offer. What was promised was that DOE would not withdraw its obligation to guarantee new funds. DOE retained its right to default Agrifuels at any time. The limitation on Keefe's authority with respect to extraordinary events would not be implicated. Under Keefe's general powers, he would have the authority to enter into an agreement, the intent of which was to protect DOE's existing financial exposure by bringing the project to completion.

*Enforceability of oral agreements.*

■ As this court's predecessor has previously stated: "[A] separate, prior oral agreement may be valid if it serves as consideration or inducement for a subsequent written contract and does not vary the terms of the written contract." *Prestex, Inc. v. United States*, 3 Cl.Ct. 373, 378 (1983) (citing *McCloskey v. United States*, 66 Ct.Cl. 105, 127, 1928 WL 2912 (1928)). Therefore, "a prior oral agreement is invalid and unenforceable, if it conflicts with or varies the terms of the subsequent written contract, since all understandings and agreements are considered to have been merged into the subsequent written contract." *Prestex, Inc. v. United States*, 3 Cl.Ct. 373, 378–79 (1983) (citing *Carden v. United States*, 87 Ct.Cl. 189, 201, 1938 WL 4068 (1938)). The court holds, for the reasons set out above, that DOE's promise to Harbert/Lummus was independent of, and did not conflict with, the agency's rights and obligations with respect to Agrifuels and the banks.

■ Oral agreements are not valid, however, when there is a specific agency regulation requiring that agreements be in writing. *Edwards v. United States*, 22 Cl.Ct. 411, 423 (1991); *see SCM Corp. v. United States*, 219 Ct.Cl. 459, 464, 595 F.2d 595, 598 (1979) (pointing to 32 C.F.R. § 16–103 (1975), which requires the use of Standard Form 30 for amendments of solicitations and the modification of contracts).

■ Defendant points to 10 C.F.R. § 799.3(j) (1988), as being a DOE regulation requiring all agreements to be in writing. Section 799.3(j), which is grouped in the general provisions of the "Loan Guarantees for Alcohol Fuels, Biomass Energy and Municipal Waste Projects" regulations, states:

*Inc. v. United States*, 30 Fed.Cl. 662, 693 (1994) (citing *Branch Banking & Trust Co. v. United States*, 120 Ct.Cl. 72, 87, 98 F.Supp. 757, *cert. denied*, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951)). "Implied authority binds the Government where a Government representative without actual authority exercises an integral part of

the duties assigned to the Government employee." *Id.* (citations omitted).

69. In addition to the plant in New Iberia, DOE had entered into similar agreements with Ten–Al and the New Energy Company to build alternative fuel plants in other areas of the country.

No representation shall be binding on the Department of Energy unless in writing and duly signed by a Contracting Officer and all instruments and modifications thereof shall not be considered as approved by the Department unless signed by a Contracting Officer.

*Id.* The Government argues that this provision precludes any oral agreements between DOE and the plaintiff.

Plaintiff counters that this section, which is placed under the heading, "Solicitation, evaluation, and approval of applications," does not apply to its alleged agreements. According to plaintiff, Keefe's offer did not involve the issuance of a loan guarantee or the solicitation, evaluation, and approval of applications for guarantees. Those events had already occurred. DOE had already bound itself to guarantee up to 90 percent of all monies advanced (up to the dollar limit). Its relationship with DOE constituted a completely separate and distinct contract outside the scope of the loan guarantee regulatory scheme.

The court agrees with the plaintiff that section 799.3(j) does not apply to the present facts. The alleged oral promises were not made during the "Solicitation, evaluation, and approval of applications." *See* 10 C.F.R. § 799.3. Instead, the agreements were made after the loan guarantee had been issued. There are separate sections within section 799 that deal with project monitoring (section 799.15), and program management and administration (section 799.21). None of these sections contain a provision requiring that agreements be in writing. The court holds that the limitation on oral agreements imposed by section 799.3(j) only applies to agreements made during the "solicitation, evaluation, and approval of applications" for "Loan Guarantees for Alcohol Fuels, Biomass Energy and Municipal Waste Projects." *See* 10 C.F.R. part 799. Keefe had authority under his general delegated powers to protect the previously-approved project by offering an inducement to Harbert/Lummus to continue working.

*Damages*

At the time the offer was made, DOE had fully performed on its obligations to guarantee borrowing requests 1 through 18. With respect to the February and March borrowing requests, DOE had approved the disbursements of funds for which it would issue a 90 percent guarantee. Its obligation to guarantee payment was never activated as to those requests because the banks refused to extend further credit. In essence, by anticipatorily breaching, however, the Government prevented itself from being called upon to guarantee future borrowing requests.

The court finds that the Government is only liable for damages resulting from work performed after February 24, but that was not yet authorized according to the payment schedule as of April 9, 1987.[70] This would include both contract work and change order work. The Government is not liable for the bonus payment or any other prior work.

### CONCLUSION

The court directs the parties to attempt to determine the correct amount of the judgment and report jointly to the court by September 30, 1996 the results of their discussions.

---

**70.** The additional limitation is due to the fact that, with respect to the March and earlier guarantee requests, DOE had approved the extension of credit for work done and authorized for payment under the 21–month schedule.